# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Case No: |
| | : | |
| v. | : | |
| | : | **VIOLATIONS:** |
| | : | |
| **CHRISTOPHER RAY GRIDER,** | : | **18 U.S.C. § 1361** |
| | : | **(Government Property or Contracts)** |
| **Defendant.** | : | |
| | : | **18 U.S.C. § 1752(a)** |
| | : | **(Restricted Building or Grounds)** |
| | : | |
| | : | **40 U.S.C. § 5104(e)(2)** |
| | : | **(Violent Entry or Disorderly Conduct)** |
| | : | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, Michelle Ball, being first duly sworn, hereby depose and state as follows:

### PURPOSE OF AFFIDAVIT

1. This Affidavit is submitted in support of a Criminal Complaint charging Christopher Ray Grider (hereinafter Grider) with violations 18 U.S.C. §§ 1361, 1752(a), and 40 U.S.C. § 5104(e). I respectfully submit that this Affidavit establishes probable cause to believe that Grider (1) did willfully injure or commit any depredation against any property of the United States, or of any department or agency thereof, or any property which has been or is being manufactured or constructed for the United States, or any department or agency thereof, or attempts to commit any of the foregoing offenses; (2) did knowingly enter or remain in any restricted building or grounds without lawful authority, or did knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engage in disorderly or disruptive conduct; and (3) did willfully and knowingly engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct

1

of a session of Congress or either House of Congress, or the orderly conduct in that building of any deliberations of either House of Congress. Specifically, on or about January 6, 2021, Grider traveled from Texas to Washington, D.C., and knowingly and willfully joined and encouraged a crowd of individuals who forcibly entered the U.S. Capitol and impeded, disrupted, and disturbed the orderly conduct of business by the United States House of Representatives and the United States Senate.

## BACKGROUND OF AFFIANT

2.   I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since September 20, 2015.   In my capacity as a Special Agent of the FBI, I have participated in and conducted multiple federal criminal investigations and arrests related to a variety of violations including violent crimes, public corruption and national security.   As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer, I am authorized to execute warrants issued under the authority of the United States.   In addition to my regular duties, I am currently also tasked with investigating criminal activity that occurred in and around the United States Capitol grounds on January 6, 2021.

3.   Unless otherwise stated, the information in this Affidavit is either personally known to me, has been provided to me by other individuals, or is based on a review of various documents, records, and reports.   Because this Affidavit is submitted for the limited purpose of establishing probable cause to support an application for an arrest warrant, it does not contain every fact known by me or the United States.   The dates listed in this Affidavit should be read as "on or about" dates.

## PROBABLE CAUSE

4.   The U.S. Capitol, which is located in the District of Columbia, is secured 24 hours a day by U.S. Capitol Police.   The Capitol Police maintain permanent and temporary barriers to

restrict access to the Capitol exterior, and only authorized individuals with appropriate identification are allowed inside the Capitol building.

5. On January 6, 2021, at approximately 1:00 p.m., a Joint Session of the U.S. House of Representatives and the U.S. Senate convened in the Capitol building to affirm the Electoral College vote in the 2020 Presidential Election. U.S. Vice President Michael R. Pence, in his constitutional duty as President of the Senate, presided over the Joint Session. The Capitol's exterior plaza was closed to the public.

6. At approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve an objection. Vice President Pence adjourned to the Senate to preside over that chamber's proceeding. As the House and Senate proceedings ensued inside the Capitol, certain individuals in the crowd forced their way through, up, and over Capitol Police barricades intended to protect the building's exterior. The crowd thereafter advanced to the building's exterior façade. Members of the Capitol Police attempted to maintain order and stop the crowd from entering the Capitol building, to which the doors and windows were locked or otherwise secured. Nonetheless, shortly after 2:00 p.m., crowd members forced entry into the Capitol building, including by breaking windows and assaulting Capitol Police officers, while others in the crowd encouraged and assisted those acts. The crowd was not lawfully authorized to enter or remain in the Capitol building, and no crowd member submitted to security screenings or weapons checks by Capitol Police or other authorized security officials.

7. Shortly thereafter, at approximately 2:20 p.m., members of the House and Senate, including Vice President Pence, were evacuated from the chambers. The Joint Session and all proceedings of the U.S. Congress were halted whileCapitol Police and other law enforcement worked to restore order and clear the Capitol of the unlawful occupants.

8.      At approximately 8:00 p.m., approximately six hours after the crowd breached the Capitol, the Joint Session resumed, again with Vice President Pence presiding.  The Vice President remained in the U.S. Capitol from the time he was evacuated from the Senate chamber until the time the Joint Session resumed.

9.      National news coverage of the aforementioned events featured video footage, which appeared to be captured on the mobile devices of persons present on the scene and which depicted evidence of numerous violations of local and federal law, including violent attacks on law enforcement officers, vandalism, and significant destruction of the U.S. Capitol building.

10.     On the evening of January 6, 2021, a story aired on KWTX-TV News 10, a local news media station located in Waco, Texas, that featured Grider on one of their segments.  It appeared from the video posted on kwtx.com that the reporter interviewed Grider via video conference.  During the interview, Grider admitted to being inside the United States Capitol building within several feet from the woman (later identified as "Ashli Babbitt") who was shot outside "Speaker's Lobby"—an area that is just feet away from the chamber of the United States House of Representatives.  Grider stated on camera, "The president asked people to come and show their support I feel like it's the least that we can do, it's kind of why I came from central Texas all the way to DC."  The story included video introduced and captioned as, "Courtesy: Chris Grider." The video showed the crowds outside the United States Capitol and the moments after the shooting. Grider told the reporter, "They were shocked as everyone else was when the people on the other side of the door, from 20 feet away, shot her in the chest.  At that point we were all panicked, we couldn't leave because there were thousands of people behind us pushing us forward."  The picture below is a screenshot of Grider's video-recorded interview with the reporter.



11. After the video aired, law enforcement gathered several videos from open sources, which corroborated Grider's admission that he was inside the United States Capitol on January 6, 2021. The video footage also showed Grider, wearing a black puffy jacket, a yellow "Don't Tread on Me" flag tied around his neck, a black backpack around his shoulders, and blue jeans. Grider was also seen outside amongst the crowd prior to the security breach at one of the Capitol Hill entrances. Below are screenshots from one of those videos, showing Grider wearing a blue surgical mask, a yellow "Don't Tread on Me" flag tied around his neck and a black puffy jacket that appeared to match the one during the KWTX-TV news interview; in one of the screenshots he is also wearing a red baseball cap. In all other footage reviewed by agents, Grider was wearing a red "Make America Great Again" cap and a blue mask over his mouth.





12. Law enforcement agents later retrieved a driver's license photo of Christopher Ray Grider and confirmed the individual depicted in the driver's license matched the appearance of the individual included in the above-referenced photos.

13. Before making his way inside the Capitol, Grider was seen on video in what appears to be the southwest side standing on a marble landing near scaffolding. He was seen holding his phone and moving it around likely taking videos or pictures of the crowd. Grider was then observed walking on the railing beside the stairs and was moving with the initial crowd that later made their way forcefully through that entrance to the Capitol.

14. Once inside the Capitol, Grider was observed in the rotunda, the hallway to the House of Representatives, and several other areas before eventually arriving outside the Speaker's Lobby where the shooting occurred. Prior to arriving outside the lobby, Grider was holding a black helmet in the air.



15. Minutes after the above depiction, the video shows Grider directly in front of the glass doors leading to the Speaker's Lobby. At one point, a man standing next to Grider wearing a fur-line hat and a black Nike shirt with a yellow Pirelli Inter Milan soccer emblem on his chest is observed attempting to break the glass window separating the mob from the House chambers. Grider is then observed handing a black helmet to this individual, then speaking to him as Grider appears to knock on the top of the helmet, signifying that it is a hard instrument. Subsequently, the

individual accepted the helmet and proceeded to use it in order to strike the glass doors (in the center and far-right hand side), breaking the glass that Babbitt eventually attempted to jump through. Video footage also captured how Grider attempted to push open the doors and then kick the doors in an attempt to breach the entrance leading to House Chamber where members of Congress were located.







16.     Within seconds, Grider was observed backing away from the Speaker's Lobby door as other individuals were screaming, "gun." The officer on the other side of the door subsequently fired a single gunshot that struck and killed Babbitt. After the shooting, several people ran out of

9

the hallway as police were yelling to get out of the way. An area was eventually cleared as a path to allow Babbitt to be carried out of the building. Grider remained and could be seen minutes after the shooting leaning over the railing to get a better glimpse of Babbitt bleeding on the floor. Grider was holding his phone over the stairway appearing to capture a video or pictures of Babbitt.

17. Based on an assessment by the Superintendent of the U.S. Capitol building, the cost to repair the damaged Speaker's Lobby doors exceeds $1,000.

## CONCLUSIONS OF AFFIANT

18. Based on the foregoing, your affiant submits that there is probable cause to believe Grider violated:

   a. 18 U.S.C. § 1361, which makes it a crime to willfully injure or commit any depredation against any property of the United States, or of any department or agency thereof, or any property which has been or is being manufactured or constructed for the United States, or any department or agency thereof, or attempts to commit any of the foregoing offenses; and

   b. 18 U.S.C. § 1752(a), which makes it a crime to (1) knowingly enter or remain in any restricted building or grounds without lawful authority to do; (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engage in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions; (3) knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions, obstruct or impede ingress or egress to or from any restricted building or grounds; or (4) knowingly engage in any

act of physical violence against any person or property in any restricted building or grounds; or attempts or conspires to do so. For purposes of Section 1752 of Title 18, a restricted building includes a posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or any building or grounds so restricted in conjunction with an event designated as a special event of national significance; and

c. 40 U.S.C. § 5104(e)(2), which makes it a crime for an individual or group of individuals to willfully and knowingly (A) enter or remain on the floor of either House of Congress or in any cloakroom or lobby adjacent to that floor, in the Rayburn Room of the House of Representatives, or in the Marble Room of the Senate, unless authorized to do so pursuant to rules adopted, or an authorization given, by that House; (B) enter or remain in the gallery of either House of Congress in violation of rules governing admission to the gallery adopted by that House or pursuant to an authorization given by that House; (C) with the intent to disrupt the orderly conduct of official business, enter or remain in a room in any of the Capitol Buildings set aside or designated for the use of— (i) either House of Congress or a Member, committee, officer, or employee of Congress, or either House of Congress; or (ii) the Library of Congress; (D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress; (E) obstruct, or impede passage through or within, the

Grounds or any of the Capitol Buildings; (F) engage in an act of physical violence in the Grounds or any of the Capitol Buildings; or (G) parade, demonstrate, or picket in any of the Capitol Buildings.

19. As such, I respectfully request that the court issue an arrest warrant for Grider.

The statements above are true and accurate to the best of my knowledge and belief.

_____
SPECIAL AGENT MICHELLE BALL
FEDERAL BUREAU OF INVESTIGATION

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 20th day of January, 2021.

_____
ROBIN M. MERIWEATHER
U.S. MAGISTRATE JUDGE